Brockenbrough, J.
The first question in this case, is, whether the order drawn by Marsh on D. A. & Co. was an equitable assignment of so much of the fund in their hands, or expected to be in their hands, from the proceeds of salt delivered or to be delivered to them, as would pay the debt due from him to Brooks ? It appears from many authorities, that one may dravwon the credit of a fund, which is not in existence, but which will arise at a future day, and that such draft is an equitable assignment of that fund, and constitutes a lien on it in the hands of him who may have the possession of it. Thus in Row v. Dawson, 1 Ves. sen. 331. an order to pay two creditors their debts out of the money due and which would be due to the drawer from Horace Walpole out of the exchequer, was adjudged to be a credit on the fund, and an assignment of so much of the debt,—and that the drawee, afier the order was depositéd with him, could not have paid the money to the drawer, without making himself liable to the creditors for the same. So, in Peyton v. Hallett, 1 Caines 363. an order obtained by White from Peyton on the agent of the latter, to pay his debt out of the sums which might be recovered in two actions at law on policies of assurance, wras declared to be “an assignment of the property to the extent of White’s demand.” And in Cutts v. Perkins, 12 Mass. Rep. 206. a draft on a merchant for the amount of freight that would become due on the delivery of goods, was declared to be a valid assignment, and the drawee having paid it, was protected against the administrator of the drawer. In these two cases, the funds on which the orders were drawn, were uncer *538 tain and precarious; the first depending on the proceeds of a law suit, and the other on the delivery of goods about to be embarked on the Atlantic. In the case of Clayton v. Fawcett, 2 Leigh 19. the letter of Fawcett would have been adjudged to be an equitable assignment, but for the condition contained in it, that the payment was to depend on the drawer’s being absent. It is clear, that, although in England choses in action are not assignable at law, yet, in equity, contingentinterests, and even the possibility of a term, may be assigned and recoveries had on them. Duke of Chandos v. Talbot, 2 P. Wms. 608. Theobalds v. Duffoy, 9 Mod. 101. Bates v. Dandy, 2 Atk. 207. Tested by these cases, I think there can be no doubt, that the order, in the present case, was an equitable assignment of the fund on which it was drawn to the extent of the debt, although the fund was not then in existence; the drawer having by his contract with the drawees, provided the means from which that fund wquld most probably arise. If D. A. & Co. had accepted the oi-der, or if it had been deposited with them (as in the case of Row v. Dawson) and the salt had been afterwards delivered to them by Marsh, there can be no doubt, that they would have been bound to pay Brooks the amount of the draft, and they could not have paid it to Marsh without making themselves liable to Brooks; or if Marsh had delivered the salt to them and then died, they could not have been justified in paying the amount to the administrator of Marsh, but must have paid it to Brooks. The death of Marsh before the delivery of any portion of the salt, and other subsequent events, give rise to the other questions to be decided.
By the contract of January 1830, Marsh agreed to manufacture from his salt wells the quantity of 13,000 bushels yearly, for three years, and to deliver the salt to D. A. Sf Co. at stipulated prices; and to secure the performance of his agreement, he leased to D. A. Sf Co. *539 for three years, all his salt wells &c. upon condition, however, -that it he, or his heirs, executors, or administrators should execute the contract, the lease should be void. He covenanted with D. A. & Co. that he, his heirs, executors, or administrators, should perform his agreement; and in default thereof, that they might enter upon the premises during the term, and execute the agreement themselves; but that till some default should occur, Marsh and his heirs, should hold the salt wells &c. It is found by the special verdict, that soon after the death of Marsh, Hatch, the defendant, took administration of his estate; that he had married a step daughter of Marsh, and after his death lived at the salt works, and the heirs of Marsh, who were minors, lived with him the first two years, during which time, Hatch had possession of the salt works, manufactured and delivered the salt to D. A. & Co. and drew from them the whole of the money due for the salt delivered: that the salt so delivered was on account, and in discharge, of the contract: that Hatch appropriated a part of the proceeds to the manufacture of salt, part to the payment of Marsh's debts, and the balance, exceeding the amount of the plaintiff’s demand, to his own use. Now, as by the covenant entered into by Marsh, he expressly stipulated, that he and his heirs should manufacture the salt; and as, although he leased the premises to H. A. Sf Co. for a term, yet they stipulated, that he and his heirs should hold them until default made; therefore, on his death, his heirs were bound to execute the agreement, to manufacture the salt, and deliver it; and, of course, they were entitled to the rents and profits ; that is, to receive the money arising from the sales of the salt made after the death of their ancestor.
In what character then did Hatch take possession of the salt works, and receive the profits of the establishment? Surely not as administrator. If Marsh had been the lessee for a term, the administrator would *540 rightfully have taken possession, and the proceeds would have been assets in his hands. But Marsh was rather the landlord, than the tenant, of this contingent term. He died seized of the fee simple, and the same estate and seizin devolved on his heirs. Hatch, then, did not take possession as administrator, but as agent of the infant heirs. In the same character, he received the money from D. A. & Co. which was -the proceeds of the real estate. Viewed in that character, he is not personally responsible to Brooks for the amount of his claim: he is responsible to the heirs; and they, by their agent, having possession of the fund on which Brooks has an equitable lien, are liable to BrooJcs for the amount of it. But they can only be made liable in a suit to which they are parties. Their money cannot be taken from them, or from their agent, without an opportunity of defending themselves against the claim. Nor can the agent, I apprehend, be reached, though he may have improperly appropriated the money to his own use, and thus abused the trust which he took on himself, except in a suit to which his principals are parties. They are not, and cannot be parties here.
I will further remark, that the plaintiff’s claim is altogether founded on equity-; and although the action of assumpsit for money had and received, is an equitable action, yet the party availing himself of it, must shew that he has a legal right to the money which he alleges that the defendant has received to his use. Under the circumstances found in this case, I think the action at law was improperly brought, and therefore that the judgment ought to be affirmed.
Brooke, J.
I am not aware of any case in which an action at law has been maintained on one of these equitable assignments. The principle of the common law, that choses in action are not assignable, seems to forbid it. A case might be supposed, in which none *541 but the plaintiff-aud defendant were interested, to which the equitable jurisdiction assumed by the courts of law in the action for money had and received to the plaintiff’s use, might apply- But this special verdict exhibits no such case. On the contrary, it exhibits a case in which the jurisdiction of a court of equity is alone competent to do justice to all the parties interested. In Row v. Dawson, the lord chancellor said, that though the law does not admit an assignment of a chose in action, the court of chancery does; and all the cases cited by Mr. Johnson, in his agument of the case of Clayton v. Fawcett, were cases in chancery. Without pronouncing decisively on the merits of the case stated in the special verdict, I am compelled to affirm the judgment of the circuit superiour court, on the ground of a want of jurisdiction in the common law court.
Tucker, P.
This, it must be admitted, is a case of some perplexity, but I am inclined tov think a careful analysis will lead us to a correct result.
The doctrine of equitable assignment, which has been so much discussed, will be found upon examination to grow out of the simplest and most obvious principles of natural justice and right. The right which every man has to dispose of his own, is equally clear, whether exerted in the sale of a horse or other chattel, or in the transfer of a right to a sum of money in the hands of his debtor. All that is necessary in this as in other cases of contract, is, that he shall have a right to transfer, and a will to transfer, and that there shall be a consideration for the act. If, therefore, one man have funds in the hands of another, he may order them to be paid to a third person; and if there be a valid consideration for that order, the right to them passes to the payee. The nature of the payee’s title, however, depends upon the subsequent act of the drawee : if he accepts the draft, the right to the fund becomes com *542 píete, consummate and legal; and, accordingly, may be enforced against him by action upon his acceptance. But the drawee, though he is the drawer’s debtor, is not bound to accept his draft against his own will. The creditor has no right to compel his debtor to become debtor to another ufan; (our statute authorizes this only in the case of assignments of assignable securities). The drawee may, therefore, refuse to accept; and in that case, he is not liable to the payee at all. But such refusal to accept, does not take away the right to the fund, which the payee has by his contract with the drawer; for the act of the drawee cannot affect the drawer’s right of disposition of his own property. He has, for valuable consideration, given the payee a right to the funds, and his debtor, who holds them, cannot gainsay his power to do so. Out of this grows the notion of an equitable transfer or assignment. If the order is accepted, the right is complete, the title to demand the fund is a legal title, and the payee may sue the acceptor and recover. If acceptance of the order be refused, three courses remain for the holder: he may either return it, in which case the parties are in statu quo: or he may sue the drawer upon it, the drawee having refused to accept it: or he may retain it, give notice to the person on whom it is drawn, not to part with the fund, and sue in equity for its recovery; for this is the case of an équitable assignment and transfer.
These principles seem clear enough. It sometimes happens, indeed, that doubts arise as to the intention of the parties: whether a mere naked authority be intended, which is of course revocable, and is therefore revoked by death, or whether it is coupled with an interest, has been the subject of controversy in some of the cases. When it is clear, that the order or power over the fund is given for satisfaction of a debt or for value, it is inferred that a transfer was intended; the transaction is looked upon and treated as a contract; *543 it is irrevocable; and thus constitutes a complete equitable assignment. But where the drawer retains a power over the fund,—where the transaction shews he had no design to part absolutely with that power,—it is looked upon as no equitable assignment, however valuable the consideration may be which moved him to its exercise. Thus in Clayton v. Fawcett's adm'r, 2 Leigh 19.—A. owing B. about 200 dollars, drew an order on C. desiring him when he collected certain money of D. to pay the whole to B. if A. himself should not happen to be present. The amount to be collected exceeded the sum due to B. and that fact, and the provision that it should be paid to B. “ if A. should not happen to be present,” were properly held to evince, that the drawer A. did not part with his power over the fund, and so there was no assignment.
From this review of the principles of an equitable assignment, it is obviously unimportant, whether it is taken as payment and satisfaction, or only as collateral security; since, in either view, the creditor has an equal right to the benefit of the fund, and the debtor has equally assented to its transfer. It may be added (as it has been a subject of argument in this case, though it is certainly a self-evident proposition) that the party who draws must have power over the fund, and a right to dispose of it, or no transfer can be effected.
Applying these principles to this case, I think it may fairly be asserted, that there was a transfer here, and for valuable consideration; namely, the payment of a debt.
It only remains, as to this matter, to inquire, whether there was a fund on which the drawer had a right to draw ? And this brings us to the examination of this singular contract. I shall content myself with saying, that the result of my examination, is, that Marsh, the fee simple owner of the estate, contracted for the manufacture upon it, of 13,000 bushels of salt annually, to be *544 delivered to D. A. Sf Co. at certain prices per bushel according to quality. To the performance of this contract he bound his heirs as well as himself. There is a singular lease to D. A. Sf Co. but as it was only to take •effect upon certain events, and as it never has been reduced to possession, we may put it out of the case. Marsh was never out of possession; and he died seized and possessed of the fee. The estate, therefore, descended to his heirs. On them the right to it, and to the profits of the salt works upon it, devolved: on them devolved the benefit on the one hand, and the obligations on the other, of this contract. The covenant being in respect of the land, and with a view to profit from its mineral, ran with it, and whatever of profit might arise from that covenant, belonged to the heirs of Marsh. They were bound, in express terms, to fulfil it; and thé estate itself was assets in their hands to pay any damages which might be recovered for failure to fulfil it. On the other hand, it is certain that the fulfilment was to their profit, and they had therefore a right to execute it. Thus, the salt was to be made by them, and the price to be paid to them.
Then, had Marsh a right to anticipate, by appropriation in his lifetime, a part of this price ? I cannot doubt it. The owner of an estate, having absolute powder over it, can appropriate or dispose of it at pleasure. If he can take it from his heirs out and out, a fortiori he can withdraw from them a temporary profit. If Marsh could have provided, as doubtless he might have done, that the whole of the profits of that contract should, after his death, pass by devise to a friend, a fortiori he might provide, that a part of those profits should be devoted to the payment of a just debt. Who can doubt, that if a landlord draw upon his tenant for the rents which may fall due at a future day, in favour of one of his creditors and dies, his title to the fund is incontrovertible ? If so, it is not perceived, that the case at bar is not equally *545 strong in favour of this power. It can make no difference, that the fund has yet no existence, or that it depends upon a contingency. The right to a contingent interest is not less unquestionable than to one which is vested ; and this is sufficiently proved by some of the cases cited at the bar.
From the view I have thus taken of the question, it appears to me, that the plaintiff Brooks, as he has retained the order, and therefore has probably looked to it as his security, has an equitable right to the amount, of it.
The question remains, can he maintain his claim for it against Hatcht Hatch is the administrator of Marsh; but, in that character, he had neither a right to proceed with the contract, nor to receive any portion of the funds. Being, however, the husband of Marsh’s step daughter, he took possession of the lands, and the heirs, who are minors, have lived with him. He has thus proceeded to execute the covenant, and has received the proceeds of the contract. To these proceeds he has personally no shadow of title. We may presume, perhaps, that he has received them as the friend and protector of the minors, and thus consider him in the relation of their bailiff or acting guardian. Having taken possession of and managed their property, we know he is so considered in equity. Whether this be so, or whether he has received the funds without any such pretence, it is equally clear to me, that this action will not lie against him. If he be the bailiff, or even the guardian of the children, and has received these funds in that character, no suit lies against him. It must be brought against them, since the principal and not the agent is the proper party defendant. Agents are not proper defendants, because they may neither know as well how to defend their principals, nor be as zealous in their defence, as themselves. It is one of the first principles of justice, that he who is to be affected by the lifigation, should be made a party to it, that he may defend himself. The *546 case is not less strong, if we consider Hatch as claim- . . ° . . mg to receive this money m his own right. As it appears to us, the conflicting rights are those of BrooJcs on the one hand, and MarsJi's children on the other. Non constat but that in a contest between them, it might be shewn, that this order was a forgery, or that it was otherwise satisfied, or that for some other cause BrooJcs has no title to recover. They at least ought to have an opportunity of contesting it, before the fund is adjudged to the plaintiff here. And how is this to be effected ? ‘By the institution of a suit by BrooJcs, for the amount of this equitable assignment, in a court of equity, where all the parties' may be convented, and all their rights adjudicated. That is the proper tribunal for settling this case. I will not say that no action at law will lie on an equitable assignment; but I think it may safely be affirmed, that none is proper, in which the rights of the parties really conflicting in interest, cannot be tried. Much has been said of the invasions of common law jurisdiction by courts of equity; but the mischief will be not less, if we suffer the common law courts to trench upon the courts of equity, and to introduce all the refinements and complexities of the latter in a trial before a jury. I concur in the opinion, that the judgment should be affirmed.
Judgment' affirmed.